IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                               **Case No. 11-40033-01-RDR**

WILLIAM JOSEPH WILLOX,

        Defendant.

## MEMORANDUM AND ORDER

This matter is presently before the court upon defendant's motion to suppress. The court has held a hearing on this motion and is now prepared to rule.

The defendant is charged with intentionally and maliciously damaging and destroying and attempting to damage and destroy, by means of fire and an explosive, a building and other real and personal property, namely Griffith Lumber Company in Manhattan, Kansas, in violation of 18 U.S.C. § 844(i). The crime allegedly occurred on April 24, 2009.

In his motion, the defendant seeks to suppress certain statements he made to law enforcement officers on May 12, 2009 and February 22, 2011. He contends that the statements were not freely and voluntarily made. The government counters that the statements were the product of defendant's free will and should not be suppressed.

Based upon the evidence presented at the court's hearing, the

court makes the following findings of fact and conclusions of law.

FINDINGS OF FACT

1. On April 24, 2009, a fire destroyed part of the Griffith Lumber Company in Manhattan, Kansas. A state fire investigator, Lamar Shoemaker, contacted Ryan Zornes, a special agent with the Bureau of Alcohol, Tobacco and Firearms (ATF), seeking assistance with the investigation of the fire. Agent Zornes is a specialized fire investigator. He has been employed by ATF for ten years. As part of his employment, he has received training on interviewing suspects and other individuals.

2. Agent Zornes drove to Manhattan on April 25, 2009 and examined the scene. Several employees of the Griffith Lumber Company, including the defendant, were interviewed about the fire. Agent Zornes had learned that the defendant had been one of the last employees to leave the area where the fire had started.

3. Agent Zornes and Shoemaker conducted the interview of the defendant. At that time, they were trying to eliminate certain accidental causes that might have started the fire, including the actions of someone smoking a cigarette or some irregular electrical activity. Both investigators wore uniforms that day. No <u>Miranda</u> warning was given. The interviews were conducted in the owner's office. The defendant was not in custody at the time. The officers sought only information about the defendant's whereabouts and his activities at the time of the fire.

4. Following the initial interview with the defendant, Agent Zornes learned some additional information about the defendant from the owner of the business, Neal Helmick. Helmick told Agent Zornes that the defendant had been in an accident earlier that day while driving a company vehicle. Helmick indicated that pursuant to company policy the defendant had to take a urine test. He noted that, if it were positive, the defendant would be terminated. Agent Zornes found it curious that the defendant had not mentioned this matter during their earlier interview. He contacted the defendant to conduct another interview.

5. Agent Zornes and Shoemaker again met with the defendant. He was asked why he had not mentioned the accident in the previous interview. The defendant said he did not think it was important. He indicated that he thought the drug test would be negative. The defendant was also not given a <u>Miranda</u> warning prior to this interview. The defendant was asked if he would take a polygraph examination. Agent Zornes thought the defendant became defensive when this request was made. The defendant agreed to take the examination and then left the interview quickly.

6. On May 12, 2009, Agent Zornes had asked several employees of Griffith Lumber Company to come to the Riley County Police Department (RCPD) to provide additional information on the fire. The employees rode to the RCPD in one vehicle. The defendant had been advised that the polygraph examination would be conducted on

that day.

7.  The polygraph examination was conducted by Michael Johnson, another special agent with the ATF. Agent Johnson has been with the ATF for 21 years. He has been a polygraph examiner for over five years. A polygraph examination consists of three stages: (1) the pre-test interview; (2) the examination; and (3) the post-test interview. During the pre-test interview, Agent Johnson familiarizes the person to be examined with how the test would be conducted and the nature of the questions. The purpose of the pre-test interview is twofold: (1) to allow the examiner to determine if the examinee is sufficiently capable of performing the examination; and (2) to put the examinee at ease. All of the stages were conducted in an interview room at the RCPD. The various stages were not recorded either by audio or video means. Agent Johnson began by providing the defendant with his <u>Miranda</u> rights. He had the defendant sign a form indicating that he was aware of his rights, was willing to proceed without an attorney, and that no promises or threats had been made to him. The defendant also signed a form consenting to the polygraph examination. In this form, the defendant agreed that (1) no threats or promises had been made to obtain his consent to the use of the polygraph; (2) he was in good mental and physical condition and no mental or physical ailment would be impaired by this examination; (3) the questions to be asked will be reviewed prior

to the examination; and (4) he could stop the interview and polygraph examination at any time. The consents were signed at 9:25 a.m.

8. On May 12th, Agent Johnson was dressed in a suit and tie. He was not wearing a badge or a firearm. The pre-test interview lasted about an hour. The polygraph examination started at 10:27 a.m. The examination lasted until 10:54 a.m. At that time, the defendant was given a break. He left the room and returned a short time later.

9. During the post-test interview, Agent Johnson told the defendant that he thought he had been deceptive during the examination. He told the defendant that he thought he was involved with the fire. The defendant initially denied any involvement with the fire. He was adamant about his lack of involvement. After a period of time, Agent Johnson left the room and Agent Zornes and Shoemaker went into the room and began discussing the defendant's involvement with the fire. They left the room and Agent Johnson returned. The defendant subsequently admitted some involvement with the starting of the fire. Agent Johnson then asked Agent Zornes to return to the room because there had been a change in the defendant's story. The defendant was asked to put his statement in writing. He wrote the following statement:

> Friday put insulation in insulation room. Then I grabbed
> A playboy & looked at it was trashed. Put the playboy on
> fire then I dropped it. Thought it was out but it wasn't
> & it was next to the insulation. I didn't think that it

>     fiberglass insulation fire I thought it was out.  I
>     Apologize for all inconviences(sic) & wasting taxpayer $.

The statement was signed by the defendant below the following language:

>     I have read the foregoing statement consisting of 1
>     pages, each of which I have signed.  I fully understand
>     the statement and I declare, certify, verify and/or state
>     under penalty of perjury that the foregoing is true and
>     correct. . . .  I made this statement freely and
>     voluntarily without any threats or rewards, or promises
>     of reward having been made to me in return for it.

Agents Johnson and Zornes signed the document as witnesses to the defendant's statement.

    10.    During the course of the various stages of the examination, the defendant was never subjected to threats or physical force.  He was never threatened with any possible charges, but may have been told that he would be held accountable.  He readily talked with the officers.  The defendant was never offered any food, but he also never requested any food or mentioned that he was hungry.  The defendant had told the officers that he had suffered a spider bite and that he had taken some medication that morning.  Nevertheless, he signed the consent to the polygraph examination and acknowledged he was in "good mental and physical condition."

    11.    After writing the statement, the defendant left the interview room.  He left at approximately 2:00 p.m.  The other employees had already left.  The defendant was given a ride back to the lumber company by Shoemaker.  During that trip, the defendant

6

told Shoemaker that the statement he had given was not factual. He said he only wrote the statement so he could leave.

12. On February 22, 2011, Agent Zornes and another ATF special agent traveled to Manhattan to again talk with the defendant. They approached him at the Cox Barbeque restaurant where he was currently employed. The defendant told them he would talk with them when he got off work. The defendant called Agent Zornes when he concluded work. Agent Zornes told him they could talk in the restaurant or in Agent Zornes' pickup truck. The defendant chose the pickup truck. The ATF agents were in plain clothes with no visible badges or firearms. After the defendant entered the truck, Agent Zornes gave him a <u>Miranda</u> warning. The defendant agreed to talk with the agents. He signed a document waiving his <u>Miranda</u> rights. This document was signed at 2:11 p.m. Agent Zornes told the defendant that their conversation would be recorded. An audio recording of the interview was made. Agent Zornes made it clear to the defendant that he was not in custody and could leave at any time.

13. The interview lasted approximately twenty minutes. The defendant initially asked why this matter was being brought back up again. Agent Zornes explained that the matter had never been concluded. He then asked the defendant why he had changed his story when he talked with Shoemaker after the polygraph examination on May 12, 2009. The defendant indicated he was scared during the

prior meeting and he wanted to get out of that interview. He noted that he had a spider bite, that he was on medication and that he was frustrated. Agent Zornes asked him why he had provided an oral statement and a written statement that was not factual. Agent Zornes explained that the explanation offered by the defendant in the written statement was consistent with the manner in which he believed that the fire had started. The defendant eventually admitted that the earlier statement was correct and factual. He said it was just a "dumb boy doing dumb stupid shit." The defendant said he was terrified at the previous meeting because he thought he might be charged with attempted manslaughter or arson and would be going to prison. Agent Zornes indicated that he appreciated the defendant's honesty and that he would make his statements known to the federal prosecutors. The defendant was told to stay out of trouble. The defendant then left Agent Zornes' pickup truck. The ATF agents made no threats and engaged in no physical violence to obtain the defendant's statement.

CONCLUSIONS OF LAW

1. "The essence of voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne." United States v. Carrizales-Toledo, 454 F.3d 1142, 1153 (10th Cir. 2006). Coercive police activity is a necessary predicate to a finding that a confession is not voluntary within the meaning of the due process

clause. See Colorado v. Connelly, 479 U.S. 157, 167 (1986). Relevant factors in determining voluntariness include: (1) the defendant's age, intelligence, and education; (2) the length of the detention and interrogation; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to or threatened with any physical punishment. Carrizales-Toledo, 454 F.3d at 1153.

    2. The court has carefully considered the evidence presented at the hearing. Based upon the foregoing findings of fact, the court concludes that the statements made by the defendant on May 12, 2009 and February 22, 2011 were voluntary. The court is not persuaded that the ATF agents used coercive activity to undermine the defendant's ability to exercise his free will. The defendant was old enough and intelligent enough to fully understand what he was told. He was repeatedly told he was not under arrest and that he could leave at any time. Neither the nature nor the length of the questioning showed any coercion or other improper tactics by the ATF agents. The interview on May 12, 2009 did last for approximately six hours. However, it was broken into several different segments and the defendant was able to take a break. He did not have any food during this period, but he never complained of any need for food or water. He had suffered a spider bite and he had been taking some medication, but there is no evidence that

either of these matters caused him to be confused or incoherent. He made it clear when he signed the consent to the polygraph examination that he was in "good mental and physical condition." He was advised of his constitutional rights prior to both interviews. He signed written waiver forms on each occasion. He was never subjected to any threats or physical force. The interview on February 22, 2011 was recorded and the recording demonstrates that it was conducted in a conversational manner with no threats or coercive activity by the ATF agents. In sum, the court is thoroughly convinced, based upon the totality of the circumstances, that the statements made by the defendant on May 12, 2009 and February 22, 2011 were voluntary.

3. Accordingly, the defendant's motion to suppress shall be denied.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress involuntary statements (Doc. # 10) be hereby denied.

**IT IS SO ORDERED.**

Dated this 23rd day of June, 2011 at Topeka, Kansas.

                                          s/Richard D. Rogers
                                          United States District Judge